T.C. Memo. 1998-196


UNITED STATES TAX COURT


MICHAEL FRIEDMAN AND MADELINE FRIEDMAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

EDWARD ROSENTHAL AND DEBORAH ROSENTHAL, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 18735-96, 18736-96.        Filed May 27, 1998.


J. Timothy Bender and Joseph P. Alexander, for petitioners.

Nancy B. Herbert and John E. Budde, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HAMBLEN, Judge:  Respondent determined deficiencies in petitioners Michael and Madeline Friedman's 1989 and 1990 Federal income tax in the amounts of $686,400 and $793,860, respectively. Respondent also determined deficiencies in petitioners Edward and

Deborah Rosenthal's 1989 and 1990 Federal income tax in the amounts of $617,446, and $811,723, respectively.[1]  The issues for consideration are: (1) Whether petitioners' S corporation realized discharge of indebtedness income pursuant to section 108(a)[2] in the 1992 taxable year, and (2) whether petitioners may increase the basis in their S corporation stock by the amount of any discharge of indebtedness income realized by the corporation.[3]

### FINDINGS OF FACT

This case was submitted fully stipulated pursuant to Rule 122.  The stipulation of facts and the exhibits are incorporated herein and found accordingly.

Petitioners Michael and Madeline Friedman resided in Pepper Pike, Ohio, at the time the notice of deficiency was issued to them.  The Friedmans filed joint Federal income tax returns for the taxable years 1989, 1990, and 1992.  On October 15, 1993, the Friedmans filed a claim for refund based on net operating loss

---

[1]These cases were consolidated for purposes of briefing and opinion.

[2]All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[3]Madeline Friedman and Deborah Rosenthal are petitioners solely by virtue of having filed joint returns with their husbands.  Hereafter, references to "Rosenthal," "Friedman," "petitioner-husband," and "petitioners" will be to petitioner-husbands.

deductions from carrybacks relating to petitioner-husband's interest in Manchester Steel, Inc., an S corporation. The Friedmans claimed refunds in the amounts of $765,440 and $792,469 for the taxable years 1989 and 1990, respectively.

Petitioners Edward and Deborah Rosenthal resided in Pepper Pike, Ohio, at the time the petition was filed in this case. On October 21, 1993, the Rosenthals filed an amended income tax return for the taxable year 1988, claiming a carryback of a net operating loss for 1991 to 1988. The Rosenthals claimed entitlement to a 1992 net operating loss which, in turn, was carried back to 1989 and 1990. Subsequently, on November 12, 1993, the Rosenthals filed a claim for refunds for the taxable years 1989 and 1990, for $834,729 and $810,331, respectively.

Respondent mailed notices of deficiency to petitioners. The deficiencies relate to petitioners' stock investment in Manchester Steel, Inc. Subsequently, petitioners filed separate petitions for a redetermination of their respective income tax deficiencies for the taxable years at issue.

## Background

Manchester Consolidated Industries, Inc. (Old Manchester), was founded in 1970 by petitioners. It was a major independent steel service center specializing in the resale and processing of carbon flat rolled steel. Old Manchester's success arose, in part, to its niche in the coated products market, specializing in

the hot-dipped galvanized and electro-galvanized steel market. The company was extremely profitable over the years, and petitioners, as its operators and investors, obtained significant returns on their investment.

Subsequently, petitioners engaged in negotiations with Vernon Bremberg (Bremberg) and Irwin Kramer (Kramer) to explore the possibility of acquiring specific assets from Old Manchester. On August 28, 1989, the foregoing negotiations culminated in a letter of intent on that date. On April 17, 1990, Manchester Steel, Inc. (New Manchester), a steel company which processed and distributed flat rolled steel and other related products, was incorporated. At the time of incorporation, petitioners purchased shares in New Manchester. Petitioners each owned 97.5 shares of New Manchester which was the equivalent of 24.375 percent apiece. The other shareholders in New Manchester were Bremberg and Kramer, who each owned 102.5 shares. Combined, Bremberg and Kramer owned 51.250 percent of New Manchester. At all applicable times, New Manchester elected to be an S corporation.

Under the sale agreement, Old Manchester retained certain assets and liabilities. Specifically, New Manchester purchased certain steel service center assets and assumed a related debt of Old Manchester. The assets acquired from Old Manchester included: (1) Tangible assets of cash, accounts receivables,

machinery, equipment, inventory, land, building, improvements, furniture, and fixtures; and (2) intangible assets such as computer lists, software, goodwill, covenant not to compete, trade name, and trademark. New Manchester, in turn, assumed $12.8 million of Old Manchester's liabilities including a secured trade debt. New Manchester was able to obtain financing for the asset purchase secured by the assets purchased from its predecessor. The loan amounts also provided New Manchester with working capital. Also, at the time of the asset purchases, Old Manchester amended its Articles of Incorporation and changed its name to E&M Investments Co.

New Manchester, however, suffered from a severe economic downturn due to a variety of outside factors. The steel company suffered significant and continuing operating losses, and, consequently, was unable to complete orders and attract business in a timely and profitable manner. Subsequently, the owners of New Manchester were unable to find a purchaser for the assets of the company.

In that regard, New Manchester claimed a $10,102,289 loss from its trade or business activities on its 1991 Federal income tax return. In the following year, the company claimed a loss of $10,751,953 from its trade or business activities on its 1992 Federal income tax return.

One of New Manchester's creditors was the International Nederlanden Bank N.V. (NMB). The foregoing debt was secured by and undertaken in connection with the acquisition of Old Manchester's assets. Since New Manchester had encountered economic and financial difficulties, NMB sought to assist the steel company to effectuate a sale of its assets. In that regard, the value of NMB's collateral had significantly decreased. Subsequently, New Manchester failed to make interest payments due on or after September 20, 1991.

On March 3, 1992, an involuntary petition for bankruptcy was filed, on the behalf of New Manchester, under chapter 7 of the U.S. Bankruptcy Code.[4] The bankruptcy case was administered in the U.S. Bankruptcy Court for the Northern District of Ohio. NMB was the senior secured lender in the aforementioned proceeding.

On March 11, 1992, the bankruptcy court granted a motion for an order conditioning the use, sale, or lease of New Manchester's property on NMB's interests being protected. Next, on March 26, 1992, the bankruptcy court entered an order for relief. It stated that, since the statutory threshold had been satisfied: "an order for relief is hereby entered thereon. The Debtor is

---

[4]A ch. 7 proceeding is, essentially, a liquidation. Conversely, a ch. 11 case is a proceeding for the reorganization of the debtor, and the idea is for the debtor to emerge from the case as an operating entity with a different capital structure. See Spiotto & Acker, A Bankruptcy and Insolvency Primer: Overview of the Reorganization Process (1997).

hereby ordered to prepare and file the required schedules no later than fifteen (15) days from the date of this entry."

On March 30, 1992, an attorney was appointed as trustee in bankruptcy. Several days later, on April 3, 1992, the bankruptcy trustee was authorized to operate New Manchester's steel business. Throughout the course of the aforementioned bankruptcy proceeding, the trustee filed periodic reports with the bankruptcy court on the state of the assets, receipts, and disbursements.

On May 4, 1992, a schedule of assets and liabilities for New Manchester, with a statement of financial affairs attached, was filed with the bankruptcy court. The Chief Financial Officer for New Manchester signed the schedule under penalties of perjury. New Manchester's assets of real and personal property were worth $9,241,153. The steel company also held intangible assets, valued at $3,991,457, such as the trade name, customer lists, and a noncompetition agreement. New Manchester's liabilities comprised $19,681,047, $57,310, and $10,622,312, segregated between creditors holding secured claims, creditors holding unsecured priority claims, and creditors holding unsecured nonpriority claims, respectively, for a total liability of $30,360,669.

On July 29, 1992, the bankruptcy court ordered certain claims to be satisfied. Pursuant to this order, NMB was paid

$3.3 million and $3.7 million, on July 30, 1992, and November 27, 1992, respectively.

On December 1, 1992, petitioners reached an agreement with Kramer and Bremberg which provided that Friedman would acquire all interest in Kramer's holdings in New Manchester. At the same time, Rosenthal would acquire Bremberg's interest in New Manchester. Before December 31, 1992, in accordance with the aforementioned agreement, petitioners became the sole shareholders of New Manchester, each, respectively, owning 50 percent of New Manchester.

On December 10, 1992, a proceeding was begun in bankruptcy court to examine allegations by certain creditors that there were "potential fraudulent conveyances and/or preferential transfers with respect to [New Manchester]" prior to the filing of the petition for bankruptcy. The creditors further alleged that, in connection with a prior leveraged buy-out of New Manchester, petitioners rendered New Manchester insolvent or undercapitalized.

On January 4, 1993, the bankruptcy court amended its order, dated July 29, 1992, and authorized the trustee to pay an additional $177,000 to NMB to apply against its secured claim. Subsequently, on March 22, 1994, the bankruptcy court authorized the trustee to pay $684,635.75 to an assignee of NMB.

Sometime in September 1993, the bankruptcy court granted the trustee's request to retain an independent law firm as special counsel to investigate and prosecute possible fraudulent conveyance claims. The trustee believed that the alleged fraudulent transfers arose from the transactions that accompanied the acquisition by New Manchester of Old Manchester's assets.

On February 24, 1994, counsel for petitioners and E&M Investments Co. served an answer to the bankruptcy court in connection with the trustee's effort to recover approximately $11 million from, inter alia, petitioners.

On February 28, 1994, petitioners submitted an offer in compromise to the trustee in the amount of $300,000 to settle the foregoing claim. Sometime in April 1994, the trustee petitioned the bankruptcy court for an order authorizing the acceptance of the offer in compromise regarding disputed claims against petitioners and E&M Investments Co., Kramer, Bremberg, and other entities. The trustee notified the bankruptcy court that

> Despite the disparity between the $11 million claim asserted by the Trustee against [petitioners], and the offer of $300,000 made by ***[petitioners] to settle the LBO litigation and any other claims of the estate against ***[petitioners], the Trustee believes the offer of settlement to be a good faith offer predicated upon ***[petitioners'] evaluation of their exposure and costs.

The trustee also noted that certain third parties or creditors might object to the terms of petitioners' offer in compromise,

but believed that the inherent risks of litigation and other factors involved supported the resolution on the terms offered. However, on April 11, 1995, at a hearing, the bankruptcy court empowered the trustee to settle and compromise his claims against all of the defendants, including petitioners, for the sum of $2.2 million to be paid by E&M Investments Co.[5]  Subsequently, the trustee was authorized to distribute the foregoing proceeds to pay certain expenses and creditors.

On November 30, 1995, the bankruptcy trustee filed a "Final Report" (Final Report) with the bankruptcy court.  The report states:

> All property of the estate, except that claimed as exempt by the debtor, without objection, or determined by the [bankruptcy] Court as exempt, has been inventoried, collected and liquidated, or abandoned. Any property not heretofore abandoned by the trustee is now abandoned.
>
> All claims have been examined and objections have been resolved.  * * *

Subsequently, on July 15, 1996, based on the trustee's Final Report, the bankruptcy court issued an order which discharged the trustee from his responsibilities, and the chapter 7 proceeding involving New Manchester was adjudged closed.

---

[5]Old Manchester's corporate successor and petitioners' wholly owned company.  See supra p. 5.

OPINION

In the instant case, the principal issue for our consideration is whether petitioners are entitled to an increase in their basis in an S corporation's stock as a result of any discharge of indebtedness income realized by that corporation.[6] However, as a preliminary matter, we must ascertain whether New Manchester, in actuality, realized COD income which, in turn, determines whether petitioners are eligible to claim and carry back, a $5,055,116 loss.

First, petitioners raise a procedural issue. They contend that the Commissioner should bear the burden of going forward with evidence establishing that the S corporation did not realize COD income in the taxable year, 1992. We find that if the burden of proof were shifted to respondent that he would have fulfilled that requirement by a substantial preponderance of the evidence before us. As will be shown below, the sum and substance of the evidence in this case reflects that the S corporation, New Manchester, did not realize COD income in the taxable year at issue.

We now turn to whether petitioners' S corporation realized COD income in the taxable year, 1992. Respondent argues that

---

[6]Discharge of indebtedness income is also referred to as cancellation of debt income (COD income). For purposes of this opinion, we refer to the income generated from the discharge of indebtedness pursuant to sec. 61(a)(12) as COD income.

petitioners have not identified the date or event by which New Manchester realized COD income under section 61(a)(12) in that year. On the other hand, petitioners contend that New Manchester received a discharge of debt in a title 11 proceeding in 1992. Specifically, petitioners infer that the appointment of a trustee to supervise and carry out the sale of the corporate assets, the collection of outstanding claims, and distributions to creditors were undertaken by the bankruptcy court itself, or pursuant to that court's approval. Consequently, petitioners suggest that these actions taken as a whole constitute a "plan" within the meaning of section 108(d)(2). Finally, for purposes of section 108(a)(2) (the insolvency exception), petitioners, in effect, argue that it was a virtual certainty that New Manchester could not make any payments, subsequent to 1992, to satisfy the indebtedness.

Section 61 defines, in a general manner, gross income as "all income from whatever source derived". Section 61(a)(12) further elaborates on this broad language by providing that gross income specifically includes amounts received from cancellation of indebtedness. A taxpayer may realize COD income by paying an obligation at less than its face value. United States v. Kirby Lumber Co., 284 U.S. 1 (1931). The underlying rationale of this principle is that a reduction in debt without a corresponding reduction in assets causes an economic gain and income to the

debtor because the assets are no longer encumbered.  A cancellation of indebtedness generally produces income to the debtor in an amount equal to the difference between the amount due on the obligation and the amount paid for the discharge.  If no consideration is paid for the discharge, then the entire amount of the debt is considered the amount of income which the debtor must include in income.  Sec. 61(a)(12).

Section 108(a)(1) provides an exclusion for COD income if (A) the discharge occurs in a title 11 case, (B) the discharge occurs when the taxpayer is insolvent, or (C) the indebtedness discharged is qualified farm indebtedness.[7]  Section 108(d)(2) defines the term "title 11 case" as "a case under title 11 of the United States Code (relating to bankruptcy), but only if the taxpayer is under the jurisdiction of the court in such case and the discharge is granted by the court or is pursuant to a plan approved by the court."

---

[7]Sec. 108(a) reads in part:

SEC. 108(a). Exclusion From Gross Income--
    (1) In general.--Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if--
        (A) the discharge occurs in a title 11 case, or
        (B) the discharge occurs when the taxpayer is insolvent, or
        (C) the indebtedness discharge is qualified farm indebtedness.

An element necessary for the existence of COD income under section 61(a)(12) is that the taxpayer was, in fact, discharged from a liability.  Whether a debt has been discharged is dependent upon the substance of the transaction.  Cozzi v. Commissioner, 88 T.C. 435, 445 (1987).  A debt is considered to be discharged at the point when it becomes clear that the debt will never have to be paid.  Id.  The test for determining when the required identifiable event occurred is a practical assessment of all the facts and circumstances surrounding the likelihood of repayment of the debt.  Id.  Any identifiable event that fixes with certainty the amount to be discharged may be taken into consideration.  Id. (citing United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398 (1927)); 2925 Briarpark, Ltd. v. Commissioner, T.C. Memo. 1997-298.

The existence of an almost imperceptible possibility that a debt may be collected at some indefinite future point does not preclude the recognition of COD income.  Exchange Sec. Bank v. United States, 492 F.2d 1096, 1099 (5th Cir. 1974); 2925 Briarpark, Ltd. v. Commissioner, supra; cf. Fidelity-Philadelphia Trust Co. v. Commissioner, 23 T.C. 527, 531 (1954).  Simply because a creditor has failed to remove a debt from its books does not signify that the debt has not been canceled.  Exchange Sec. Bank v. United States, supra.

Moreover, the abandonment of collateral otherwise deemed worthless and which represents a debt's sole payment source is an "identifiable event" which establishes the moment when the underlying debt is discharged. Cozzi v. Commissioner, supra at 445-447; see also Brountas v. Commissioner, 74 T.C. 1062, 1074 (1980), supplementing 73 T.C. 491 (1979), vacated and remanded on other grounds 692 F.2d 152 (1st Cir. 1982), affd. in part and revd. in part on other grounds sub nom. CRC Corp. v. Commissioner, 693 F.2d 281 (3d Cir. 1982).

As a general matter, petitioners assert that respondent narrowly interprets the word, "discharge" for purposes of section 108(a). In particular, petitioners' arguments focus on the words "title 11 case," in section 108(a)(1)(A) and (d)(2). Petitioners assert that the bankruptcy court's assumption of jurisdiction over New Manchester, and the trustee's undertaking to manage New Manchester's affairs in bankruptcy, occurred in a title 11 case in 1992 and should, therefore, be deemed to constitute a discharge of indebtedness for purposes of section 108(d)(2). Conversely, respondent argues, that, during 1992, the bankruptcy court did not effectuate a plan which discharged New Manchester's outstanding debts, or, in fact, grant such a discharge. In that regard, respondent points out that New Manchester possessed assets at the end of the taxable year, 1992, and that the

bankruptcy trustee was still actively pursuing claims beyond that date.

We reject petitioners' expansive reading of section 108(a)(1)(A) and (d)(2) which is contrary to the fundamental principle of statutory construction that where a statute is clear on its face, unequivocal evidence of legislative purpose is required to override the plain meaning of the words used. Huntsberry v. Commissioner, 83 T.C. 742, 747-748 (1984).

The language in section 108(d)(2) is fairly explicit. It provides that a "title 11 case" means a case under title 11 (the bankruptcy code), but only if the taxpayer is under the jurisdiction of the bankruptcy court and the discharge of indebtedness is "granted by the court or is pursuant to a plan approved by the court". Sec. 108(d)(2). Consequently, we read the statute to contemplate that, in general, in a title 11 case, the bankruptcy court must grant the discharge either in a specific order, or as part of a plan approved by the court itself.

We observe that the bankruptcy trustee was active in conducting New Manchester's business as well as disbursing amounts to creditors after the 1992 taxable year. In that vein, the trustee periodically filed reports with the bankruptcy court on the status of the foregoing proceedings. Certain creditors filed a fraudulent conveyance claim against petitioners on

December 10, 1992. This claim was settled, in 1994, when petitioners' wholly owned company paid $2.2 million to the bankruptcy trustee. These funds were, in turn, utilized to satisfy the outstanding claims of creditors. Finally, in late 1995, the bankruptcy trustee delivered a Final Report which concluded that all claims had been settled. In the following year, the bankruptcy court issued a final order which ruled New Manchester's bankruptcy proceeding to be closed. Thus, a practical assessment of the relevant facts and circumstances does not indicate or, even, suggest that the underlying indebtedness was extinguished or discharged by the bankruptcy court in 1992. Cozzi v. Commissioner, supra at 445-447.[8]

Petitioners argue that New Manchester was insolvent, and as a practical matter, there was a de facto discharge of indebtedness, in 1992. Sec. 108(a)(1)(B). The parties have, in effect, stipulated that New Manchester was insolvent. In that regard, petitioners assert that it was exceedingly improbable that the outstanding liabilities would ever be paid. However,

---

[8]We note that, in addition, under the provisions of a ch. 7 bankruptcy proceeding, a "discharge" may not be granted to a debtor who is not an individual. Stated in a different manner, New Manchester, as a corporate debtor, was ineligible for a "discharge" under the aforementioned ch. 7 proceedings. 11 U.S.C. sec. 727(a)(1) (1994)(effective for the years at issue). In that regard, there are procedures which provide the debtor to an absolute right to convert the case to a case under ch. 11. 11 U.S.C. sec. 706(a) (1994).

there must be an identifying event or other evidence to show that a debt has, in fact, been discharged.  See, e.g., United States v. S.S. White Dental Manufacturing Co., supra at 401 (any "identifiable event" which fixes the loss with certainty may be taken into consideration); Exchange Sec. Bank v. United States, supra at 1099; Bickerstaff v. Commissioner, 128 F.2d 366, 367 (5th Cir. 1942); Cozzi v. Commissioner, 88 T.C. at 444; Kent Homes, Inc. v. Commissioner, 55 T.C. 820, 828-831 (1971), revd. on other grounds 455 F.2d 316 (10th Cir. 1972); Cotton v. Commissioner, 25 B.T.A. 1158 (1932), affd. 68 F.2d 1486 (D.C. Cir. 1933).[9]  In this instance, there was no identifying event or forgiveness on the part of the creditors that gave rise to discharge of indebtedness income during the 1992 taxable year. Cozzi v. Commissioner, supra.  Accordingly, we hold that petitioners' S corporation did not realize COD income for the 1992 taxable year.

Finally, even if the S corporation had realized COD income for that year, we have held that, where such income is shielded from recognition by section 108(d)(7)(A), it does not operate to increase the basis of the shareholders.  Nelson v. Commissioner,

---

[9]See also Brountas v. Commissioner, 74 T.C. 1062, 1074 (1980), supplementing 73 T.C. 491 (1979), vacated and remanded on other grounds 692 F.2d 152 (1st Cir. 1982), affd. in part and revd. in part on other grounds sub nom. CRC Corp. v. Commissioner, 693 F.2d 281 (3d Cir. 1982).

110 T.C. 114 (1998).  Thus, petitioners, as S corporation shareholders, would be precluded from increasing their basis in the corporate stock on account of COD income excluded from the corporation's gross income.  Cf. <u>Winn v. Commissioner</u>, T.C. Memo. 1998-71.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>